EDWIN PRATHER, SBN 190536
PRATHER LAW OFFICES
245 Fifth Street, Suite 103
San Francisco, CA 94108
Telephone: 415.881.7774
Email: edwin@pratherlawoffices.com

Attorneys for Defendant
JASON OPPENHEIMER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 24-0170 JD |
| Plaintiff, | **DEFENDANT JASON OPPENHEIMER'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE** |
| v. | |
| JASON OPPENHEIMER, | Hearing Date: March 17, 2025, at 10:30 a.m. |
| Defendants. | Judge: The Honorable James Donato |

1

**TABLE OF CONTENTS**

2   I.    INTRODUCTION…………………………………………..………………3

3   II.   PROCEDURAL HISTORY………………………………………..………………3

4   III.  STATEMENT OF FACTS…………………………………………………………4

5   IV.   PRESENTENCE INVESTIGATION REPORT…………………………………………5

6   V.    SENTENCING GUIDELINE CALCULATION……..……………………………5

7   VI.   SENTENCING RECOMMENDATION………………………………………..6

8
    A.    The Nature and Circumstances of the Offense, as well as Mr. Oppenheimer's
9         History and Characteristics, Support the Recommended Sentence…………...….6

10        1. Nature and Circumstances of the Offense…………………………………...…7

11        2. Mr. Oppenheimer's Personal History and Characteristics……………...……9

12             a. Mr. Oppenheimer's Background…………………………………..…….9

13             b. Mr. Oppenheimer's Mental Health Issues…………………………10

14             c. Mr. Oppenheimer's Entry into a Dual Diagnosis Residential
               Treatment Program…………………………………………………..….…14

15             d. Mr. Oppenheimer suffers from Chron's Disease………………...……15

16   B.    A Sentence of Time Served Meets the Directives of 18 U.S.C. § 3553(a)(2)…...16

17        1. The Recommended Sentence Reflects the Seriousness of the Offense,
18        Promotes Respect for the Law and Provides Just Punishment for the Offense….17

19        2. The Recommended Sentence Affords Adequate Deterrence……………..……17

20   VII.  MR. OPPENHEIMER REQUESTS THAT THE COURT ALLOW HIM TO
          COMPLETE HIS RESIDENTIAL TREATMENT PROGRAM……………………18
21

22   VIII. CONCLUSION…………………………………………………………………18

23

24

25

## I.     INTRODUCTION

Defendant Jason Oppenheimer stands before the Court having accepted responsibility for his actions by pleading guilty to a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) for the possession with intent to distribute tapentadol, a narcotic pain reliever.  For the reasons indicated herein, the Court should consider a downward variance and sentence Mr. Oppenheimer to a custodial sentence of 24 months followed by three years of supervised release.  Such a sentence is an appropriate resolution to punish Mr. Oppenheimer for his actions, but also to consider his personal issues under 18 U.S.C. § 3553(a).  A sentence of 24 months followed by three years of supervised release meets the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further crimes.

## II.     PROCEDURAL HISTORY

On March 19, 2024, the government filed the Indictment against Jason Oppenheimer for the possession with the intent to distribute tapentadol, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C).

On June 24, 2024, Mr. Oppenheimer pleaded guilty to Count One of the Indictment under a plea agreement with the government pursuant to Federal Rules of Criminal Procedure 11(c)(1)(A) and 11(c)(1)(B).  Mr. Oppenheimer will stand before the Court for sentencing on March 17, 2025, at 10:30 am.

///

///

///

### III.    STATEMENT OF FACTS

For almost 20 years, Jason Oppenheimer has been diagnosed with Bipolar Disorder II. He is addicted to medication and needs it to function.  His entire life has been involved with mental health issues and substance abuse, illicit or prescribed.  As part of his addiction, Mr. Oppenheimer sought out sources for his drug dependency and self-medication.

In 2020, Mr. Oppenheimer found his way to "ALLDAYCHEMIST," a major online pharmacy based in India.  Over time, Mr. Oppenheimer purchased a number of items from ALLDAYCHEMIST including ointments, antibiotics, and medications.  After establishing a rapport and relationship with Mr. Oppenheimer, individuals from ALL DAYCHEMIST including, *inter alia,* Aatif Shaikh of Mumbai, India, contacted Mr. Oppenheimer and recruited him to do something they described as simple and easy.  These individuals proposed, and Oppenheimer agreed, for Mr. Oppenheimer to receive controlled substances from ALLDAYCHEMIST and then, at the direction of Mr. Shaikh, to re-package and ship those controlled substances to other customers in the United States.  Thus, began Mr. Oppenheimer's actions as a re-shipper for this India-based network.

Mr. Oppenheimer tracked his shipments and throughout his communications with Mr. Shaikh, shared documents and notes regarding orders with Mr. Shaikh.  For his role in this scheme, Mr. Oppenheimer received a small fee of $20 per 180 pills shipped.

On September 14, 2022, agents were notified by Customs and Border Patrol (CBP) that a package destined to a P.O. Box used by Mr. Oppenheimer had been seized.  The package was shipped from the United Arab Emirates and found to contain alprazolam, a drug used to treat anxiety disorders, panic disorders, and anxiety caused by depression..

On September 22, 2022, a federal search warrant was executed on Mr. Oppenheimer's residence and approximately 57,749 Carisoprodol pills (approximately 50.847.7 gross grams) and approximately 40,280 Tapentadol pills (approximately 27,623 gross grams) were discovered and seized. The lab reports from the U.S. Drug Enforcement Agency (DEA) were received confirming the tapentadol and carisoprodol pills.

Additional controlled substances and uncontrolled substances were also identified at Oppenheimer's home during the execution of the search warrant, but those substances were determined to be in a quantity consistent with personal use and not for sale or distribution. The DEA conducted no other lab analysis on other substances.

## IV.    PRESENTENCE INVESTIGATION REPORT

All objections and edits to the Presentence Investigation Report have been addressed with the U.S. Probation Department. Mr. Oppenheimer has no objections to the PSR.

## V.    SENTENCING GUIDELINES CALCULATION

Pursuant to the United States Sentencing Guidelines ("U.S.S.G."), which are advisory after the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), Mr. Oppenheimer has a total offense level of 25 for his offense. PSR at ¶¶ 46-54.

The total offense level is reached by starting with a base offense level of 32, based on the drug quantity. *See* U.S.S.G. §§ 2D1.1(a)(5). Here, a two-level safety valve decrease applies,[1] *see* U.S.S.G. §§ 2D1.1(b)(18).

---

[1] Mr. Oppenheimer provided a full safety valve interview with the U.S. Attorney's Office and at least one investigating agent from the DEA. The interview was described as truthful and candid as the parties explored whether a case could be made against Aatif Shaikh and others from ALLDAYCHEMIST. Mr. Oppenheimer understood the government did not have enough evidence to pursue a case against ALLDAYCHEMIST.

Mr. Oppenheimer's adjusted offense level of 30 is then decreased by three levels for his acceptance of responsibility, *see* U.S.S.G. §§ 3E1.1(a), and by an additional two levels by virtue of Mr. Oppenheimer's status as a zero-point offender. *See* U.S.S.G. §§ 4C1.1(a) and (b). This results in a final total offense level of 25. PSR at ¶¶ 16-26.

Lacking any criminal contacts or criminal record, Mr. Oppenheimer's criminal history score is zero and his criminal history category is I. PSR at ¶¶ 27-33.

As such, Mr. Oppenheimer's adjusted offense level of 25 indexed with a Criminal History Category I yields an advisory Guideline range of 57-71 months. The parties agree on this calculation and Guideline range.

## VI.    SENTENCING RECOMMENDATION

Mr. Oppenheimer submits that a sentence of 24 months, reflecting a variance from the Sentencing Guidelines, along with three years of supervised release is an appropriate resolution to his case. The sentence is sufficient and not greater than necessary to comply with the directives of 18 U.S.C. § 3553(a). Here, the nature and circumstances of the offense and Mr. Oppenheimer's history and characteristics, the need for the sentence imposed to reflect the seriousness of the offense and to afford adequate deterrence, all militate in favor of a variance to a 24-month sentence.

### A.  The Nature and Circumstances of the Offense as well as Mr. Oppenheimer's History and Characteristics Support the Recommended Sentence

Under 18 U.S.C. § 3553(a)(1), "the court, in determining the particular sentence to be imposed, shall consider the nature and circumstances of the offense and the history and characteristics of the defendant." These two factors support a downward variance and Mr. Oppenheimer's recommended sentence.

### 1. Nature and Circumstances of the Offense

Online pharmacies provide access to common medications as well as to more critical medicines not readily available with offline pharmacies.  As commerce becomes increasingly digital and global, it is natural that medicine too will be sold online and from outside of the United States.  Much of the world's medication comes from India.  India's online pharmacies, which are backed by some of the world's top investors,[2] provide over 20% of the world's medicine and over 60% of the world's vaccines.[3]  The India-based pharmaceutical industry also boasts the highest number of U.S. FDA-approved plants outside the United States.[4]

However, the sale of pharmaceuticals online creates regulatory issues and hidden dangers.  Obtaining pharmaceuticals, prescription medication, and other medicines through the internet is potentially dangerous and opens the door for misuse and abuse.  It has been and continues to be a significant challenge for the FDA to regulate online sales.[5]

It is against this backdrop that Mr. Oppenheimer started purchasing medicines from ALLDAYCHEMIST, the India-based online pharmacy.  While the purchase of some products online from outside of the United States is safe and legal, some products are not.  Eventually, Mr. Oppenheimer was approached by, *inter alia,* Aatif Shaikh, who recruited Mr. Oppenheimer

---

[2] How Online Pharmacies Have Landed in a Regulatory Limbo (May 29, 2023), https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/how-online-pharmacies-have-landed-in-a-regulatory-limbo/articleshow/100598081.cms?utm_source=contentofinterest&utm_medium=text&utm_campaign=cppst.

[3] Krishnakali Sengupta, The Rise And Rise of the Pharmaceutical Supply Chain in India (February 27, 2024), https://www.maersk.com/insights/growth/2024/02/27/pharmaceutical-supply-chain-in-india.

[4] *Id.*

[5] FDA Takes Action with Indian Government to Protect Consumers From Illicit Medical Products (February 18, 2020), FDA News Release, https://www.fda.gov/news-events/press-announcements/fda-takes-action-indian-government-protect-consumers-illicit-medical-products.

to re-ship pills -- regulated pharmaceuticals -- to some of ALLDAYCHEMIST's customers in the United States.  Mr. Oppenheimer received controlled substances from ALLDAYCHEMIST and then, at Mr. Shaikh's direction, re-shipped those controlled substances to other customers in the United States.  On September 22, 2022, agents found approximately 57,749 carisoprodol pills and approximately 40,280 tapentadol pills at Mr. Oppenheimer's residence.

Two things are notable regarding Mr. Oppenheimer's offense for the Court's consideration.  First, Mr. Oppenheimer did not control nor manage the volume of product he received or re-shipped.  Pills were sent to Mr. Oppenheimer from ALLDAYCHEMIST and Mr. Shaikh provided Mr. Oppenheimer with instructions on how and when to re-ship those pills.  Mr. Oppenheimer had no decision making authority.  He was a pawn to ALLDAYCHEMIST.

Second, Mr. Oppenheimer was a re-shipper, not a seller nor a dealer of carisoprodol or tapentadol.  Individual buyers with no knowledge of, or contact with, Mr. Oppenheimer found the ALLDAYCHEMIST website on their own.  Those buyers placed *their own orders* for carisoprodol, a muscle relaxant, or tapentadol, a narcotic pain reliever used to treat moderate to severe acute pain, *on their own*.  These buyers paid ALLDAYCHEMIST for their orders *on their own*.  The transactions for these controlled substances occurred between the buyers and ALLDAYCHEMIST completely independent of Mr. Oppenheimer.  Mr. Oppenheimer did not sell, broker a sale, serve as a middleman, or otherwise involve himself as a "drug dealer" in this scenario.  He handled no money.  He identified no potential customers.  He did not tempt buyers, or encourage them, or solicit orders.  Mr. Oppenheimer re-directed these buyers' orders of pills after the orders had already entered the United States.  Mr. Oppenheimer's involvement was to ship the box after the order was already made and the transaction had been already completed.

In this vein, Mr. Oppenheimer's actions and the nature and characteristics of his crime evince his involvement after-the-fact. While pictures do tell a story, it cannot be forgotten that a buyer and seller agreed on a quantity and price without Mr. Oppenheimer. His contribution to the overall transaction is minimal and militates in favor of a 24-month sentence.

### 2.  History and Characteristics of Mr. Oppenheimer

#### a.  Mr. Oppenheimer's Background

Jason Oppenheimer is 52 years old having been born in New York City in 1972. PSR at ¶ 35. Jason has an older brother and a younger half-sister and was raised in the State of New York until his parents divorced when Jason was seven years old. *Id.* at ¶¶ 35-36. Jason's childhood was confused and disorganized while his parents sorted out their own lives and Mr. Oppenheimer's needs became secondary. *See* Declaration of Edwin Prather in Support of Jason Oppenheimer's Sentencing Memorandum and Request for a Downward Variance ("Prather Decl."), ¶ 2, Ex. A, Psychological Evaluation from Dr. Scott Lines, ("Dr. Lines Report"), p. 2 ("…his mother's reaction to his father taking custody was to remove herself from any maternal responsibility … and his father prioritized dating women over parenting his sons and quickly remarried his younger law firm receptionist.").

Due to what appears to be parental indifference, Jason's childhood was marred with being subjected to physical, verbal, and sexual abuse as a child as described in the Presentence Report. PSR at ¶¶ 37-38.

Jason attended public schools through high school and worked at part-time jobs, including, *inter alia,* a newspaper route, working at a dry cleaner, etc. Prather Decl. at ¶ 2, Ex. A, Dr. Lines Report, p. 2. But without parental supervision, a junior-high aged Jason started smoking marijuana with friends after school, drinking alcohol, and experimenting with attention deficit/hyperactivity disorder (ADHD) medication that Jason stole from his older brother. *Id.* at p. 3. Jason also stated using psychedelics at the age of 15 and became addicted. *Id.* at p. 4.

Jason learned how to be a functioning addict and still excelled at school. He was accepted at and graduated from Cornell University with a Bachelor of Science (1994) and master's degree (1997) in Agricultural and Biological Engineering. Prather Decl. at ¶ 2, Ex. A, Dr. Lines Report, p. 2; PSR at ¶ 53.

Soon thereafter, Jason met Jamie Jefferson and the two moved to Berkeley, California to start a life together. Jason also went on to obtain a second master's degree from the University of California at Berkeley in Business Administration in 2003. PSR at ¶ 53. That same year, Jason and Jamie married. Prather Decl., ¶ 2, Ex. A, Dr. Lines Report, p. 3.

Jason and Jamie have two children: a son, Lucas, age 19, and a daughter, Avery, age 15. Lucas was diagnosed with autism at a young age and the couple focused on providing Lucas with early intervention and occupational therapies for his development. PSR at ¶¶ 40-41. Jason tried his best to be a provider as well as a good husband and father. Prather Decl., ¶ 3, Ex. B ("Letter from David Oppenheimer") ("Jason is a devoted father, caring brother, and dedicated family member. He has always cared deeply for those around him, and I know he wants to be a productive member of society."). But even Jason did not know the demons that he was battling back then just to allow him to function and deal with life's everyday problems. Those around Jason then and now recognize in hindsight that Jason had always suffered from substance abuse, psychiatric, and mental health issues.

### b. Mr. Oppenheimer's Mental Health Issues

It is no surprise Mr. Oppenheimer's family members suffer from mental health issues, including Mr. Oppenheimer's mother, older brother, and aunt, who is reported to have attempted suicide, and that it affected his formative years and plays a role in his life as a 52-year-old man. *See* Prather Decl., ¶ 2, Ex. A, Dr. Lines Report, p. 5. Mr. Oppenheimer's mental health issues were always present but not recognizable until he was in his 20's. The symptoms were there, but it was not until Mr. Oppenheimer was in his 30's that he was diagnosed with Bipolar Disorder

II.[6]  *See* Prather Decl., ¶ 2, Ex. A, Dr. Lines Report, p. 4.  At that time, he was prescribed mood

stabilizers and anti-depressants as well as ADHD medication.  *Id.*  His treatment continued for a

few years where his psychiatrist described him in 2010 as: "Patient severely depressed,

uncontrollable tears, poor concentration, wish for death, irritable-violent at home, poor sleep,

poor function."  *Id.*  His wife, Jamie Jefferson, described how debilitating Jason's bipolar

condition was:

> She described how she began to notice his mood swings when they moved to Berkeley,
> with him enrolling at the Haas Business School. He cycled between not sleeping for days
> and not being able to get out of bed; he would spend money he didn't have on gadgets
> and electronics; he would begin projects around the house, for instance, installing new
> siding, and work on them chaotically non-stop, day and night.  "He would be really hyper
> and angry, then slowly become really sad," she said. He had one job after business school
> at Pax Water Technologies, where he became paranoid, thinking his employer was
> violating engineering ethical standards.  He quit precipitously after eight years, thinking
> he would have no trouble finding another job, only to be unemployed for years.  She said
> he became depressed and angry, would drive around all night.  She described one
> incident when he called her, not knowing where he was or even who he was.

*See* Prather Decl., ¶ 2, Ex. A, Dr. Lines Report, p. 6.

In 2012, after a union of almost 10 years, Ms. Jefferson and Mr. Oppenheimer separated

based on the burden placed on their relationship by Jason's emotional and mental instability.  He

hit rock bottom after the separation and Mr. Oppenheimer spiraled downward to no end.  In

2013, his instability led to a major depressive episode causing him to be hospitalized for 48

hours.  *Id.*  While hospitalized, the treating physicians confirmed Jason's Bipolar Disorder II

diagnosis and also added an Anxiety Disorder diagnosis.

---

[6] Bipolar disorder, formerly called manic depression, is a mental health condition that causes
extreme mood swings. These include emotional highs, also known as mania or hypomania, and
lows, also known as depression.  Bipolar II Disorder is involved where at least one major
depressive and one hypomanic episode is present.  Bipolar Disorder, Mayo Clinic,
https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-
20355955.

DEFENDANT JASON OPPENHEIMER'S SENTENCING MEMORANDUM
AND REQUEST FOR DOWNWARD VARIANCE [Case No.: CR 24-0170 JD]

11

In 2013, Mr. Oppenheimer had no means to obtain treatment, therapy, or medication. Left to his own devices, Mr. Oppenheimer sought to self-medicate with cheap poly-substances, the combined use of multiple psychoactive substances, believing he had no other choice. Turning to inexpensive drugs procured "on the street" allowed Jason to survive, but he dug himself a deeper hole. This cycle continued for many years. Mr. Oppenheimer never sought treatment, never got clean, and did just enough to get by. Mr. Oppenheimer suffered in this manner for many years even while trying to put on a good act for Ms. Jefferson and their children. And it is true that Mr. Oppenheimer was still suffering in this manner during the commission of the offense conduct in this case.

] Dr. Scott Lines, a psychologist, evaluated Mr. Oppenheimer in December 2024 for the purpose of assessing Mr. Oppenheimer's current mental state and retrospectively assessing his mental and emotional condition at the time of his admitted offense conduct. Dr. Lines reviewed Mr. Oppenheimer's medical and mental health history and records, conducted additional interviews, and reviewed the relevant facts of this case. *See generally* Prather Decl., ¶ 2, Ex. A, Dr. Lines Report.

Dr. Lines concluded that Mr. Oppenheimer currently suffers from three psychiatric disorders: Bipolar II Disorder, Attention-Deficit Hyperactivity Disorder (ADHD) and Polysubstance Use Disorder. *Id.* at p. 5. Dr. Lines concluded that there is a "high likelihood that Mr. Oppenheimer possesses a genetic link regarding his psychiatric disorders" and that "the impact on his mental capacity is to seriously compromise his judgment." *Id.* Mr. Oppenheimer's "driven impulsivity and poor judgment sometimes tips over into what could be termed a manic episode, thus meeting diagnostic criteria for the more severe Bipolar I Disorder." *Id.*

Dr. Lines continued with a more detailed analysis regarding Mr. Oppenheimer's mental functioning at the time he was involved with re-shipping for ALLDAYCHEMIST. "Bipolar II

Disorder is characterized by mood states that cycle between significant depression, with

vegetative signs such as affective blunting, hypersomnia, low energy, poor judgment and

consequent low functioning, and hypomania, characterized by a presentation of brittle ebullience

with underlying irritation, feelings of invincibility and consequent poor judgment.  Prather Decl.,

¶ 2, Ex. A, Dr. Lines Report, p. 5; *see also* Prather Decl., ¶ 4, Ex. C Jaime Jefferson Letter

("Jason can take actions that are illogical, reckless and which another person would view as

inherently risky and impulsive. This ties into the activities he engaged in leading to these federal

charges. …I believe … he did not truly appreciate the illegality or the risk or the potential for

doing harm.").

     Dr. Lines further opined that:

> Jason Oppenheimer, for all his complications and problems, is a man driven not so much by criminal intent as by his long history of poor judgment, impulsivity and depression that constitute his psychiatric disorders. Amid these struggles, he has obtained two degrees from an Ivy League institution and an MBA from UC Berkeley, a notable public institution; he has an extensive work history, hampered not by choice but by his psychiatric disability. He has no criminal history. My clinical opinion is that this man needs and desires treatment for these disorders, which a term of custody would only worsen.

Prather Decl., ¶ 2, Ex. A, Dr. Lines Report, p. 7-8.

     Dr. Lines recommended in January 2025 that Mr. Oppenheimer immediately enter into a

residential dual diagnosis treatment program utilizing psychotherapy, group drug treatment,

psychiatric medication and case management.  *Id*. at p. 8 ("Mr. Oppenheimer desperately needs

the combination of drug treatment and consistent medication management to bring his care back

to the standards of good medical practice and provide him with the adequate care his condition

warrants.").

     Dr. Lines concluded his report with the belief that:

> Incarceration would be extremely detrimental to Mr. Oppenheimer. The prison environment is inherently harmful to one's mental health due to the consequent disconnection from family, society, and social support, loss of autonomy, diminished

meaning and purpose of life, fear of victimization, increased boredom, the unpredictability of surroundings, overcrowding and punitiveness. Mr. Oppenheimer's mental issues are not likely to be addressed or treated while in custody. A dual diagnosis residential program such as New Bridge Foundation in Berkeley or a similar program should be considered.

Prather Decl., ¶ 2, Ex. A, Dr. Lines Report, p. 8.

### 3. Mr. Oppenheimer's Entry into a Dual Diagnosis Residential Program

Mr. Oppenheimer took Dr. Lines' advice to heart and for the first time in his life, Mr. Oppenheimer enrolled himself in a residential treatment program. On February 21, 2025, a bed space opened up for Mr. Oppenheimer and he entered into the residential treatment program at Align Recovery Center in Sonoma County. *See* Prather Decl., ¶ 7, Ex. F ("Letter from Align Recovery Center"). For over 17 days, Mr. Oppenheimer has focused on "tackling the physical and psychological root causes of [his] substance abuse disorder and the co-occurring nature of his mental health disease." *See id.* Align Recovery Center "uses evidence-based therapies with holistic treatments to address not just the physical impact of addiction but also its emotional and psychological roots." *Id.* At Align, a dual diagnosis approach is used to address Mr. Oppenheimer's "particular re-occurring mental health concerns and co-occurring substance abuse issues." *Id.* "In addition to his individual sessions and therapies, Mr. Oppenheimer attends daily groups that address depressive disorders, cognitive behavioral therapy, dialectical behavioral therapy, relapse prevention, mindfulness, boundaries, and anger management. Mr. Oppenheimer meets consistently with his case manager to ensure daily progress." *Id.*

According to Michael Ohayon, the Operations Director at Align Recovery Center, Mr. Oppenheimer is on schedule and on plan:

Mr. Oppenheimer is scheduled to complete his 30-day residential treatment program on March 23, 2025. We recommend that at that time he be transitioned to a 60-day intensive residential program to further address and reinforce Mr. Oppenheimer's treatment and care. After Mr. Oppenheimer completes this initial three-month intensive residential treatment program plan, we would recommend another three-month intensive program, for a total of six months. (The final three months may be a combination of inpatient and outpatient depending on Mr. Oppenheimer's progress). Years of substance abuse and

> neglect of Mr. Oppenheimer's mental health issues cannot be solved in a matter of weeks. Six months is the minimum recommended treatment term in dual diagnosis situations, and certainly in the case of Mr. Oppenheimer. These are issues that Mr. Oppenheimer will have to deal with for the rest of his life, but 180 days of treatment gives him a fighting chance to address his needs and build a successful life.

Prather Decl., ¶ 7, Ex. F, Letter from Align Recovery Center.

This criminal matter has been life changing for Mr. Oppenheimer in many ways. It created the opportunity to talk about the elephant in the room and force Mr. Oppenheimer to address his mental health and substance abuse issues never before discussed with Ms. Jefferson or his family. Mr. Oppenheimer has been able to discuss years of trauma and abuse with his family and in individual and group therapy. He has made breakthrough strides by recognizing and accepting his addiction while venturing out on the path towards recovery. Mr. Oppenheimer's willingness to address his mental health and substance abuse issues by entering into a residential treatment program is significant as it is the first time he has ever sought and received treatment for his issues.

### 4. Mr. Oppenheimer has Crohn's Disease

Mr. Oppenheimer also suffers from Crohn's Disease, a disease where parts of the digestive tract become inflamed. Crohn's Disease, Penn Medicine, https://www.pennmedicine.org/for-patients-and-visitors/patient-information/conditions-treated-a-to-z/crohns-disease. Crohn's Disease may occur on any part of the digestive system but often involves the lower end of the small intestine and the beginning of the large intestine. *Id.*

Mr. Oppenheimer's Crohn's Disease has been particularly acute, persistent, and severe in recent years. Prather Decl. ¶ 5, Ex. D ("Letter from Dr. Anthony Jones"). His condition caused extensive fistulous disease requiring surgery in the past and more surgeries in the near future. *Id.* Mr. Oppenheimer's condition also calls for meticulous and persistent wound care management and immunosuppressive therapy. *Id.* Given these various factors, Mr. Oppenheimer is at high

risk for additional fistula infection, as well as respiratory, skin, and soft tissue infections.  Prather Decl. ¶ 5, Ex. D, Letter from Dr. Anthony Jones ("I have serious concerns for his health and safety if he were to be detained in a situation where he had high risk for MRSA or other skin or soft tissue infection or contact with others which could lead to communicable disease."); *see also* Prather Decl., ¶ 3, Ex. B, Letter from David Oppenheimer ("Jason has also faced significant hardships, including both psychological struggles and severe medical issues. He has battled a Crohn's-type disease that required extensive medical care, including surgery that left him with ongoing complications. Despite these challenges, he has remained dedicated to his family and continues to push forward.").

Mr. Oppenheimer's Crohn's Disease should be taken into consideration by the Court as he will have difficulty managing his medical issues while in custody.

In light of the nature and circumstances of the offense, including the effect of Mr. Oppenheimer's mental health history on the offense conduct, and Mr. Oppenheimer's history and characteristics, including his mental health and medical history and his voluntary entry into a residential treatment program, as well as his other factors under 18 U.S.C. § 3553(a), the Court would be warranted in providing a downward variance to a 24-month custodial sentence.

**B. A Custodial Sentence of 24 Months Meets the Directives of 18 U.S.C. § 3553(a)(2)**

18 U.S.C. § 3553(a)(2) directs the Court to consider, *inter alia,* "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" and "to protect the public from further crimes… ."  18 U.S.C. § 3553(a)(2)(A), (B), and (C).  A 24-month custodial sentence followed by three years of supervised release meets the directives of 18 U.S.C. § 3553(a)(2).

**1.  The Recommended Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment for the Offense**

It bears repeating that Mr. Oppenheimer was a re-shipper and not a dealer nor salesman. Mr. Oppenheimer did not control nor manage the volume of product he received or re-shipped. Pills were sent to Mr. Oppenheimer and Mr. Shaikh directed Mr. Oppenheimer on how and when to re-ship those pills.  Mr. Oppenheimer had no decision making authority.  Also, Mr. Oppenheimer did not sell, broker a sale, serve as a middleman, or otherwise involve himself as a "drug dealer" in this scenario.  He handled no money.  He identified no potential customers.  He did not tempt buyers, or encourage them, or solicit orders.  Mr. Oppenheimer re-directed these buyers' orders of pills after the orders had already entered the United States.

A 24-month custodial sentence for a safety valve eligible case involving a zero-point defender with no criminal record or contacts is a significant sentence which accurately accounts for the seriousness of the offense, promotes respect for the law, and provides for just punishment.

**2.  The Recommended Sentence Affords Adequate Deterrence**

Empirical evidence is unanimous that no relationship exists between sentence length and general or specific deterrence, regardless of the crime type.  *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").

This is Mr. Oppenheimer's first criminal contact, first arrest, first criminal charge, and first conviction.  Having a federal conviction on his record will limit future employment prospects and cause severe collateral consequences for the rest of Mr. Oppenheimer's life.  As a

1
2
zero-point offender and first-time arrestee at the age of 52, it is not likely that any further specific

deterrence is necessary.

3
4
5
6
As for general deterrence, while illicit drugs, and illegal pharmaceuticals are major

societal issues, Mr. Oppenheimer was a re-shipper and did not involve himself in the transaction.

Any custodial sentence given to Mr. Oppenheimer provides meaningful general deterrence to

anyone considering involvement in drug trade, even at the level of re-shipping.

7
8
The recommended sentence of 24 months in custody followed by three years of

supervised release provides adequate specific and general deterrence.

9
10
### VII.    MR. OPPENHEIMER RESPECTFULLY REQUESTS THAT THE COURT ALLOW HIM TO COMPLETE HIS RESIDENTIAL TREATMENT PROGRAM

11
12
13
14
15
16
17
18
Mr. Oppenheimer respectfully requests that the Court allow him to complete the

residential treatment program through Align Recovery Center and their partner organizations

before his surrender on any custodial sentence in this matter.  This may be achieved by either

postponing the final imposition of a sentence or by imposing a sentence but extending the

surrender date such that Mr. Oppenheimer may complete his six-month program.  Should the

Court be open to such an arrangement, Mr. Oppenheimer requests that he not begin any custodial

sentence until after September 1, 2025.

19
### VIII.   CONCLUSION

20
21
22
23
24
25
Ms. Jefferson said it best when describing the complicated puzzle that is Jason

Oppenheimer in considering his actions and potential sentence.  She shared her belief that Mr.

Oppenheimer needs medical and psychological evaluation and treatment and that she fears that

confinement for him will only worsen his illness and further hinder his ability to be a productive

member of society.  *See* Prather Decl. ¶ 4, Ex. C, Letter from Jamie Jefferson.

For the foregoing reasons, namely, the Court should sentence Mr. Oppenheimer 24-month in custody followed by three years of supervised release.  Such a sentence is an appropriate resolution to this case to both punish Mr. Oppenheimer for his actions, but also in consideration of his personal issues under 18 U.S.C. § 3553(a).  It is a sentence that is sufficient, but not greater than necessary.  It reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from further crimes.

Dated: March 10, 2025                            Respectfully submitted,


                                    _____/s/_____
                                    EDWIN PRATHER
                                    PRATHER LAW OFFICES
                                    Attorneys for Defendant
                                    JASON OPPENHEIMER